# SUPREME COURT.

## THE PEOPLE agt. QUIMBO APPO.

If a court of *oyer and terminer* have the power to grant a *new trial* in any case (and the weight of authority seems to be in favor of such a power), it can only be on the ground that the court is *not an inferior court*, and the motion must be made before the *same court*, held by the same judge who tried the case.

There is no authority or power for a *subsequent* court of *oyer and terminer* to hear a motion for a new trial, where the trial was had before a different judge at a *previous court*, or to nullify the judgments and proceedings of such previous court.

By the constitution and the statutes, the court of *oyer and terminer* was organized an *independent court*, not continuing, as the other courts, with succeeding terms, &c., but merely continued as they had previously existed, for the purpose of disposing of the criminal business properly belonging to the supreme court, and terminating with all its powers at the time of its adjournment, without any right or authority in a succeeding court to review or change the proceedings and judgment rendered by any previous court.

*New-York General Term, December,* 1859.
*Present,* ROOSEVELT, SUTHERLAND *and* INGRAHAM, *Justices.*

THIS was an appeal from the decision at oyer and terminer of Justice ROOSEVELT, granting a new trial to the defendant. The reasons of the judge were given as follows :

ROOSEVELT, J. The prisoner Appo, a Chinaman by birth, was convicted at a court of oyer and terminer, held in April last, of the crime of murder. Sentence of death was pronounced upon him, but its execution was temporarily suspended, by the intervention of the governor, to enable the defendant to apply for a new trial. That application he now makes, at a different term of the court, on various grounds stated in the papers. The district-attorney objects to its being granted, first, because the court, as he insists, has no power; and, second, because, in his view, the reasons alleged are insufficient.

After much examination and reflection, I have come to the conclusion that these objections are not well founded.

The oyer and terminer is the highest court of original jurisdiction in criminal cases. Although at one time, in the earlier periods of English history, a mere temporary commission, it has long since ceased to be so, and is now a permanent court of record, recognized in the constitution as an existing superior tribunal, over which a judge of the supreme court is to preside, but not, according to the language of that instrument, an " inferior court " to be established at will by the legislature, and to be abolished at any time by the same authority. And in a recent statute (chap. 72, § 1), passed in 1854, it is not only spoken of as having, like the supreme court, its regular terms, but—somewhat inaccurately, perhaps—as being "the court of oyer and terminer of this state." The Code, too, (§ 20), declares that there shall be, at least, two terms of the circuit court and court of oyer and terminer held annually in each of the counties, &c.

But although a continuous court, and not a temporary organization, dying at each final adjournment, it may still, it is contended, have no power to grant new trials.

In the case of *Carnel* (1 *Parker*, 256), decided in 1851, a motion for a new trial was entertained and was denied, not on the ground of want of power, although the point was raised, but on the ground of want of merits. In the case of *Morrison* (*same vol.* 625), three years later, the whole subject was elaborately discussed by Judge HARRIS, all the previous authorities being reviewed, and a new trial granted.

The practice in England, it may be conceded, is not to grant new trials in cases of felony, but to leave the party, however strong the evidence may be of his innocence, to an application for the royal mercy. Such a practice may, perhaps, be in harmony with the spirit of a monarchial government; but, in the language of our constitution, it is " repugnant to the government " established by us, and with all other parts of the common law of like character, and has been, on three successive occasions, " abrogated and rejected " by our people. (*Consti-*

*tution of* 1787, § 35 ; *also Constitution of* 1822, *art.* 17 ; *also Constitution of* 1846, *art.* 1).

There is no fitness in compelling a free citizen, if innocent, to sue for pardon. Pardon implies guilt. We may well imagine a case in which the supposed victim of an alleged murder should appear in full life after sentence of death had been pronounced against his supposed murderer. Shall it be said, under our system of law, that, with such newly discovered evidence staring it in the face, the court has no power to grant a new trial ? In the language of Judge HARRIS, " the most obvious principles of common justice require it." And, "upon authority," also, I concur in regarding the power of the court to grant a new trial, where the circumstances clearly call for it, "as established beyond all possible controversy." (*See the cases collected in* 1 *Parker*, 627).

The next inquiry, then, is, has a sufficient case been made to warrant the intervention of the court ?

Laying out of view, for I attach no importance to it, the affidavit of Twaddel, I think it quite clear, on the other papers presented, that the prisoner's poverty and his ignorance of our customs and institutions, natural to a Chinese subject, has deprived him of the benefit of substantial matters of defence, which, had they been presented, would, in all probability, have led to a different result—to a verdict of manslaughter instead of murder, if not to a verdict of acquittal.

By the court—INGRAHAM, Justice. A motion was made in a court of oyer and terminer, held after that in which the prisoner was tried, convicted, and sentenced, for a new trial upon the merits. No error of law was alleged, but the motion was founded upon matters appearing on the trial.

The justice who held that court decided to grant a new trial, upon the ground that the prisoner's poverty and ignorance of the customs and institutions of the country had deprived him of the benefit of substantial matters of defence, which, had they been presented, would, in all probability, have led to a verdict of manslaughter, if not to an acquittal.

People agt. Appo.

That these reasons were very proper ones to be submitted to the executive for a pardon or a commutation of the sentence, will be denied by no one; but it may well be doubted whether ignorance of the institutions of the country ought in any case to be considered a sufficient cause for granting a new trial in a criminal case, after a fair trial has taken place, and the court before which the prisoner was tried has finally passed sentence on the prisoner, and closed its business. The same reason urged in this case might be used in very many of the criminal cases constantly occurring in our criminal courts. If it was suffi- cient cause on the first trial and conviction, I see no reason why it should not be equally availing after a second or third conviction, unless it was made to appear that the prisoner, during the time which may elapse between the different trials, had been instructed in the customs and institutions of the country, so as to render him more responsible for the results on a second trial than he was on the first. Sympathy for the prisoner under these circumstances, and pity for his condition, may well be exercised, but should not have the effect of pro- ducing an evil in the administration of criminal justice which would be attended with far greater evil than could in anywise result from a necessary appeal to the pardoning power in any individual instance. It becomes, therefore, a question of great importance to decide, whether a new trial for such a cause can be granted by a subsequent court of oyer and terminer in a case which was not tried in that court.

The district attorney moves for a writ of prohibition to the justice holding the court before which the motion was made, directing him not to proceed in granting such new trial.

The decision of this application rests merely on the question, whether the various courts of oyer and terminer, held in each judicial district, are to be considered as different terms of one continuing court; or different courts, each complete in itself; or mere adjuncts to the supreme court, in carrying into effect the powers which that court has, in regard to the disposition of criminal cases which may come before it.

A slight examination of the constitution of these courts in

England will show that there they are not continuing courts. Originally, the commission to hold an oyer and terminer was only issued when some special offence had been committed, and the court was only held for the trial of that particular case. Afterwards, their powers were so enlarged by the commission, as to authorize the court to hear and determine all matters, &c., then undetermined; and so strict was the rule, as to the powers of the court, that it was held that they could only try such cases as were before them on indictments found while the court was in session. (*See* 1 *Chitty's Cr. Law*, 104; 4 *Black. Com.* 290.) This difficulty was remedied by statute in England, and has been also provided against here, by allowing the court to entertain jurisdiction over indictments sent from the sessions.

The oyer and terminer there was less extensive in its jurisdiction than that of the commission of general jail delivery, which allowed the trial of cases whenever the indictment was found, if the prisoner was in confinement. The distinction in this country has not been observed between these courts; but, until the adoption of the constitution of 1846, the powers of the court under either commission were always united under the common title of courts of oyer and terminer and general jail delivery.

The latter part of the name appears to have been dropped since that time, both in the constitution and statutes, and these courts have, since that time, been known as courts of oyer and terminer; but, as they are continued merely by the constitution and statutes, the change in the name would not be held as in any way altering the powers and jurisdiction of the court, and the powers formerly possessed by both are now specially granted to the oyer and terminer. (2 *R. S.* 205.)

In England, the oyer and terminer originally had both civil and criminal jurisdiction. In the introduction to *Sellon's Practice* (*Vol.* 1, *p.* 70), in regard to this court it is said, that the records are made up in the king's bench, and go down to be tried in the proper county before the itinerant justices, after which they are returned back to the higher jurisdiction, with

the verdict, for the purpose of entering up judgment, and carrying that judgment into execution.

In the history of the judicial organization of this state, by Judge DALY, in the first volume of *E. D. Smith's Reports*, a reference is made to an act of the colonial legislature in 1691, establishing a supreme court in New-York, with all the jurisdiction of the courts of England.

By this act, it is said, the court of oyer and terminer was abolished, but, in conformity to the organization of the courts of Westminster, *its name was retained to designate the criminal circuit of the supreme court.*

From this organization of the supreme court sprang the court which ever since has been known in this state under that name, and with the court has at all times been united a circuit and an oyer and terminer, doing the civil and criminal business of the court whenever an inquiry into facts with the aid of a jury was necessary, modified at times by statutes, but still retaining the same distinctive features which were seen in the court as originally established.

By the act of 1813 (1 *R. Laws, p.* 335), which law was a revival of laws previously in force, circuit courts were directed to be held in each of the counties of the state, and by the eighth section provision is made for the adjournment of such circuit court, if the justice should not be present on the first day; and it also directs that the oyer and terminer, which shall be held at the same time and place, shall be likewise adjourned; and if the justice did not appear on the second day, all persons bound to appear at that court should be bound to appear *at the next court* of oyer and terminer to be held in that county. It is here spoken of as another court, and not as a term of the same court.

The fifteenth section directs who are to hold the courts of oyer and terminer, and the sixteenth makes it the duty of the district attorney to issue precepts to bring the business of the oyer and terminer at the next circuit court, as soon as may be after the circuit court is appointed.

An examination of this act will show clearly that both

courts were to be commenced together, and were to be con-
tinued as long as the justice holding the same should think to
be necessary; and authority was also given to continue the
oyer and terminer for so long as might be necessary to dis-
patch the business of the court. The circuit court was re-
quired to return the proceedings to the supreme court, and the
oyer and terminer were to hear and determine all matters
triable before them, and to deliver the jails of the prisoners
according to law.

And for this purpose the sessions were directed by statute
(2 *R. Laws, p.* 156) to send all indictments, not tried before
them, to the next court of oyer and terminer, which court was
to remit to the sessions if not tried at this court.

It is apparent, from these provisions, that neither the circuit
nor the oyer and terminer was, by this act, to be a court con-
tinuing any longer than during its session. The oyer and ter-
miner was to dispose of all its business, either by hearing and
determining the indictments found, or by remitting to the ses-
sions such as were not tried; and for this object the act pro-
vided that the court should continue until all the business
before it was disposed of. The constitutions of 1777 and of
1822 did not provide for any new court in the place of the
supreme court, circuit, or oyer and terminer, but provided for
continuing to the judge of the supreme court the powers there-
tofore possessed in those courts.

The constitution of 1846 more particularly continues those
courts, and, in the 14th article, section 5, speaks of the courts
of oyer and terminer thereby established. The powers, how-
ever, of the courts remain the same.

By the 9th section of the 6th article it is provided "that
the times and places of holding of the *terms* of the court of
appeals, and of the general and special terms of the supreme
court within the district, and the circuit courts and courts of
oyer and terminer within the several counties, shall be pro
vided by law." It provides for the terms of the court of ap-
peals and of the supreme court, but makes no provision for the
terms of the oyer and terminer, but only for the time of hold-

People agt. Appo.

ing the courts. The provision as to the justice to hold the courts, is equally distinct. The justices of the supreme court may hold terms of the supreme court, and may preside in the courts of oyer and terminer.

If the court was a continuing court, there would not be courts of oyer and terminer in a county, but one court having different terms; but the constitution, while using the word "terms" as applicable to the supreme court, omits the use of that word in connection with the courts of oyer and terminer.

By the act of 1847 (*chap.* 280), courts of oyer and terminer, after the adoption of the constitution, were continued with the same powers and duties, and the same provisions, so far as was consistent with the constitution and that act.

In the direction to the district attorney, in section 37 of that act, to issue a precept to the sheriff to summon a jury, it refers to the court then next to be held, or any other court of oyer and terminer, and not to succeeding terms of the same court.

All these provisions, and many others that might be enumerated, would be unnecessary, if the various courts of oyer and terminer, held in the same county, were to be considered but one court. The business could be continued from term to term, there would be no need of remitting indictments to the sessions, and no new commission for an oyer and terminer from the governor would be required, but only an additional term of a court then in existence.

By the Code, the governor is authorized to appoint extra terms of the supreme court, and extra circuits and courts of oyer and terminer.

It will not be contended that the circuit court is an independent court, having separate terms, and yet the same provisions of law apply to that court as are used in regard to the oyer and terminer, and the former might with as much propriety be called a separate court as the latter.

It is true that, in some statutes of late, the word "term." has been used in referring to the oyer and terminer. In some cases this power of expression has been used evidently with-

out any regard to the organization of the court, and only in reference to the time of the sitting of the court.

I should not suppose such an expression could ever be considered as sufficient to warrant a change in the organization of the court, if it was not consistent with the previous powers of the court.

From this examination of the provisions of law, as applicable to this court, I am led to the conclusion that it was not the intention of the framers of the constitution, or of the statutes, to organize an independent court, continuing, as the other courts, with succeeding terms, &c., but merely to continue the courts of oyer and terminer as they had previously existed, for the purpose of disposing of the criminal business properly belonging to the supreme court, and that each court terminated in all its powers at the time of its adjournment, without any right or authority, in a succeeding court, to review or change the proceedings and judgment rendered by any previous court of oyer and terminer.

There are some cases in which the power of the court to grant new trials has been discussed, and the contradictory decisions on this point leave the question still undecided. In *The People* agt. *Stone* (5 *Wend.* 39), it was held that the court of oyer and terminer could grant new trials upon the merits.

In the same case (9 *Wendell*), it was held, that the court might vacate an order made at a previous court to quash an indictment. This was done, however, to permit the district attorney to make up and file a record, and the order was one made before judgment.

In *The People* agt. *Comstock* (8 *Wend.* 549), it was held, that the court could not grant a new trial. That was, however, a case of acquittal; and whether the oyer and terminer had power to entertain the motion for a new trial on behalf of the defendant was not considered.

In *The People* agt. *The Judges of Dutchess Oyer and Terminer* (2 *Barb. S. C. Rep.* 282), it was expressly held, that the oyer and terminer had not the power of granting new trials. This decision was by the general term of the second district, and was

based upon the holding that the oyer and terminer was an inferior court, and therefore could not grant a new trial.

In *The People* agt. *Morrison* (1 *Parker Cr. Rep.* 625), Mr. Justice HARRIS held, that the court possessed the power of granting new trials. In this case the motion was made before the same court at an adjourned day, and there is no reason to suppose that it was not also decided before the same court.

And in *The People* agt. *Goodrich* (3 *Parker*, 518), Justice BALCOM expressed the opinion that the court had power to grant new trials, but it was not necessary to the decision of that case, as the court denied the motion upon other grounds.

The contradictory opinions expressed in these cases show that the question is by no means settled by adjudication. I do not see in them anything, however, irreconcilable with the views I entertain on the question now before the court.

In no one of the cases does it appear that the motion was made to a subsequent court held by a different judge.

, In all of them it is fair to presume, from the statement of the cases, that the motion was made at the same court in which the trial had taken place.

Conceding, therefore, that the weight of authority is in favor of the power of the court to grant a new trial, and this can only be on the ground that the court is not an inferior court, still, the question remains open whether a subsequent court can exercise the power. I am of the opinion, that the court cannot thus nullify the judgments and proceedings of a previous court.

The motion for the writ should, therefore, be granted.