QUIMBO APPO, plaintiff in error, *v.* THE PEOPLE, defendants
in error.

Prohibition from the Supreme Court lies to prevent the exercise of unauthorized power in a cause or proceeding of which the subordinate tribunal has jurisdiction, no less than when the entire cause is without its jurisdiction.

The Oyer and Terminer in the several counties is a permanent and continuous court. Its successive sessions are terms of the same, and not distinct tribunals.

The Oyer and Terminer has no power to order a new trial upon the merits, after a conviction for felony.

WRIT of error to the Supreme Court. Quimbo Appo was tried and convicted of murder, and sentenced to be executed therefor, by a Court of Oyer and Terminer held in and for the city and county of New York, in April, 1859. The court adjourned *sine die* on the 16th of June following.

On the first Monday of October, in the same year, a Court of Oyer and Terminer was held in and for the same city and county, before Mr. Justice ROOSEVELT, and on the 17th of ·

October Appo made an application to the last mentioned court to set aside his conviction and sentence, and grant him a new trial. The application was founded on the minutes of Mr. Justice DAVIES, before whom the conviction took place, and on affidavits alleging injustice done him on his trial, newly discovered evidence, &c.

The district attorney denied the power of the court to enter-tain or grant such a motion and declined to answer it on the merits. The court affirmed its power and announced its inten-tion to grant the motion. The district attorney thereupon sued out an alternative writ of prohibition, addressed to Appo and the court, forbidding the exercise of this jurisdiction. The writ was returnable at the general term of the Supreme Court on the first Monday of December, 1859. On the return day the court, on argument, rendered judgment, awarding a prohi-bition absolute, from which judgment Appo brought error to this court.

*David Dudley Field,* for the plaintiff in error.

I. The writ of prohibition is a remedy, nearly obsolete, never demandable as a matter of right, and when granted is confined to those cases in which there is no other remedy. If, therefore, it were clear that the Oyer and Terminer had no power to grant Appo a new trial, and that the Supreme Court had the power to interfere, it should nevertheless not revive against human life this almost forgotten writ: but in favor of mercy and of life, should leave the district attorney to his remedy by writ of error. If Appo should hereafter have judgment in his favor, for any cause other than an acquittal by a jury, the People may bring error under the act of 1852 (*ch.* 82), and review the order for a new trial; and if such order be a nullity, the appel-late court will render judgment against the prisoner upon the original conviction. (*Ex parte Braudlacht,* 2 *Hill,* 367.)

II. The Supreme Court has not the power to interfere by prohibition with the granting of a new trial, in a criminal action, over which the Oyer and Terminer had general juris-

Quimbo Appo *v.* The People.

diction, for it is a general principle that where a court has jurisdiction over an action, its orders made in that action, though never so erroneous, cannot be reëxamined on a writ of prohibition. (1 *Tyr. and Gr.* 227 ; 3 *Steph. Com.* 685, *a. r. ; ex parte Gordon,* 2 *Hill,* 363; *People* v. *Seward,* 7 *Wend.,* 518; *People* v. *Supervisors of Queens,* 1 *Hill,* 101.)

III. The Supreme Court has not the jurisdiction in any case to issue a prohibition to the Oyer and Terminer any more than the Queen's Bench in England has jurisdiction to issue a prohibition to the Common Pleas or the Exchequer. The Court of Oyer and Terminer is the highest court of criminal jurisdiction in the State. It may issue its process into any county (2 *R. S.,* 247, § 43). "Inferior local courts of civil and criminal jurisdiction may be established by the legislature in cities." (*Const., art.* 6, *p.* 14.) Such courts are the Superior Court of Buffalo and the City Court of Brooklyn, and such also in civil matters are the Superior Court and Common Pleas of this city. The Courts of Oyer and Terminer are higher than these.

IV. If, however, it were conceded that the Supreme Court could issue a prohibition to the Oyer and Terminer, and by such prohibition could prevent its making an order for a new trial in a case over which it had full jurisdiction, still it could not issue its prohibition in this case, because the Oyer and Terminer had the power to grant the new trial as it has done. The only question is one of power. The propriety of its exercise cannot here be examined. If, for any cause whatever, a Court of Oyer and Terminer, after judgment, and at a subsequent term, can grant a new trial, the present attempt to control it must fail. The power then may be tested by supposing an extreme case: Let us suppose that upon an indictment for murder the jury has just returned a verdict of guilty, and that while the jury is yet in the box, the counsel at the bar, and the prisoner in the dock, the person supposed to be murdered should enter the court, and the witnesses should confess that the accusation, trial and conviction were the fruits of a conspiracy to take life under the forms of law, would the court be bound by the law of the land to proceed, nevertheless, and

pronounce the sentence of death? If it would not, then it might grant a new trial at the same term, and before sentence. But suppose that the court had pronounced the sentence and had adjourned, all which might have happened within the hour, and that before the judge, the counsel, the prisoner, and the spectators had left the room the lost man had re-appeared and the conspiracy been confessed, is there no power confided to the judiciary of saving from the scaffold the innocent victim of the conspiracy? Must he depend for his life upon the clemency of the Executive extended to him as a suppliant suing for pardon? It is in this form that the question of power may be fairly presented. It is confidently submitted that our judicial institutions are not thus faulty, and that the power to relieve an innocent man does exist somewhere in the tribunals.

V. The power to grant new trials is an incident of every court of superior jurisdiction. The first reported case is in *Style*, 466—since which time the power has been fully established. (*See Lord* MANSFIELD *in* 1 *Burr.*, 394; *and the cases and comments in Graham and Waterman on New Trials, Introduction*, 2, 3, *and vols.* 2 *and* 3.)

VI. The Court of Oyer and Terminer is a court of superior jurisdiction. It has jurisdiction over every crime. Because it is limited in territorial extent that does not make it a court of inferior jurisdiction, any more than the territorial limits of the circuit and district courts of the United States make them courts of inferior jurisdiction. The Constitution of the State does not class the Court of Oyer and Terminer among the inferior courts. (1 *Va. Cas.*, 172; *Com.* v. *Crump.*, 2 *Park.*, *C. R.* 653; 3 *id.*, 518; *McCormick* v. *Sullivan*, 10 *Wheat.*, 192.)

VII. The power of criminal courts of general jurisdiction to grant new trials in cases of felony has been decided so often in this country that it is not now a debatable question. (*Whart. C. L.*, 981–1019; *U. S. Dig. Crim. Law*, 561–592.)

VIII. The power of our Courts of Oyer and Terminer to grant new trials in cases of felony is also settled by authority. No doubt ever existed on the subject till the case of *The People* v. *Comstock* (8 *Wend.*, 549), and to this day that case and

the case in 2*d Barbour*, 182, are the only authorities against the power, while there are several authorities before and since, in its favor. (*People* v. *Stone*, 5 *Wend.*, 39; *People* v. *Morrison*, 1 *Park. C. R.*, 625, *Approved in The People* v. *McMahon*, 2 *Park. C. R.*, 673; *People* v. *Goodrich*, 3 *id.*, 518; *People* v. *Hartung*, 17 *How.*, 86; *The People* v. *The Court of Sessions of Wayne*, 1 *Park. C. R.*, 370; *Miller* v. *Finkle*, 1 *Park. C. R.*, 374.) The case of *The People* v. *Comstock* (8 *Wend.*, 549), was where the application was made by The People after the acquittal of the defendant. (*People* v. *Judges of Dutchess Oyer and Terminer*, 2 *Barb.*, 282, *where the decision is put upon the ground the Oyer and Terminer is an inferior court.*) The objection that such a power would expose an accused person to be twice put in jeopardy is utterly fallacious. If it were not so a judgment could never be reversed for cause, and a new trial ordered, in any criminal case. The new trials ordered in *People* v. *M'Kay* (18 *John.*, 212), in *People* v. *Cancemi* (16 *N. Y.*, 503), and *People* v. *Shepard* (19 *N. Y.*, 537), would have been unconstitutional.

IX. The objection that the granting of new trials in criminal trials would lead to frequent applications proves nothing. The possibility of abuse of power is no evidence that the power does not exist, nor any reason why it ought not to exist. There is probably at this moment no civilized country on the globe, which does not allow the review of trials and judgments in criminal cases. In England the old rule has long been condemned by her wisest lawyers and judges, and is now abandoned. (2 *Denison's Crown Cases*, 286; *Queen* v. *Scaife*, 6 *Brit. Crown Cases*, 286; *See the 8th Report of the English Comrs.*, 18–33, 159, 264, 221; *Report of N. Y. Comrs.*, 256; *Livingston's Code of Criminal Pro.*, ch. 12; *Act erecting the Superior Court of Buffalo*, 1854, *ch.* 96, § 35.)

X. It, the Oyer and Terminer, has the power to grant a new trial at the same term, and before judgment; it has also the power to grant it at a subsequent term. The court is a continuing one; its several sittings are terms. " All such process, if issued when the said Court of Oyer and Terminer and Jail Delivery is not in session, may be tested on any day in the last

preceding term of the said court." (*Laws of* 1823, 212, § 9.) " Whosoever at the time appointed for the commencement of any term of the Court of Oyer and Terminer, or of any term of the Court of Sessions, or at any time during such term, etc." (*Laws of* 1847, *ch.* 280, § 40, *as amended, ch.* 470, § 35.) " When the office of district attorney of any county shall be vacant at the term of any Court of Oyer and Terminer or Court of Sessions of any county, or the district attorney shall from any cause be unable to attend the term of any such court, the members of the court, except the justice of the Supreme Court, may designate some suitable person to act as district attorney at such term of the court." (*Laws of* 1847, *ch.* 470, § 33.) " There shall be at least two terms of the Circuit Court and Court of Oyer and Terminer held annually in each of the counties of this State, and as many more terms thereof, and as many special terms as the judges of each judicial district shall appoint therein ; but at least one term shall be held annually in each of said counties." (*N. Y. Code*, § 20.) See the same use of the word " term " in respect to the Courts of Sessions. (3 *R. S.*, 304, 307, *5th ed.*) The seal is made for the Court of Oyer and Terminer of the county. (2 *R. S.*, 507, § 40.) The clerk is the clerk of the Court of Oyer and Terminer of the city. (1 *R. S.*, 97 ; *People* v. *Stone*, 9 *Wend.*, 182 ; *see also* 9 *Cow.*, 735.) Courts of Sessions are upon the same footing as the Courts of Oyer and Terminer in respect to their continuance from term to term. (3 *R. S.*, 304, 307, *5th ed.*) In these courts it is a frequent practice to sentence at a term subsequent to the conviction.

XI. It has also the power to grant the new trial after the sentence. This power has been long exercised in civil actions, and there seems to be no reason why the same should not exist in criminal actions. New trials in criminal cases depend upon the same principles which have been established in civil cases. (*Whart. Crim. Law*, 983 ; 5 *T. R.*, 436 ; *King* v. *Holt, see remarks of* GROSE, *Justice*, 446 ; *King* v. *Gough, Doug.*, 798 ; *State* v. *Price*, 3 *Halsted*, 358.) The power to open judgments has long been exercised in civil cases. (*Soulden* v.

Quimbo Appo *v.* The People.

*Cook,* 4 *Wend.,* 217 ; *Com.* v. *Peck,* 1 *Met.,* 428 ; *People* v. *Cancemi, note,* 16 *N. Y.,* 503.) This power is examined and asserted in *Miller* v. *Finkle* (1 *Park. C. R.,* 374).

This shows that the sentence is no bar to a new trial.

*John T. Doyle,* for The People, defendants in error.

I. The writ of prohibition is the proper remedy. 1. It lies whenever an inferior court, tribunal or officer exceeds its jurisdiction; and even where the inferior tribunal has jurisdiction of the subject matter, and is proceeding in the exercise of that jurisdiction, to determine incidentally a question over which it has no authority. (*F. N. B.,* 39 *H.,* 40 *K., &c.; Jac. Law Dict., verb Prohibition; Byerley* v. *Windus et al.,* 5 *B. and C.,* 1; *Darby* v. *Cosens,* 1 *T. R.,* 552.) 2. The October Court of Oyer and Terminer, before which this motion was made, had not jurisdiction of the subject matter. There was no *lis pendens* before it—a previous Court of Oyer and Terminer had tried the traverse, rendered judgment, and passed sentence. The whole case was *res judicata.* No court but one of appellate jurisdiction could disturb the judgment. (2 *R. S.,* 205, § 29.) 3. There is no other adequate remedy.

II. As to the power of the Court of Oyer and Terminer in the present case. 1. A Court of Oyer and Terminer has no power in any case to set aside a verdict and grant a new trial. If a conviction should be had on testimony unsatisfactory to the court, or if evidence newly discovered should cast a reasonable doubt on the prisoner's guilt, the Executive alone can interfere. It was for the purpose of correcting such errors that the power of pardon was confided to the Governor. It is not proposed to discuss this question at length, as its determination is not necessary in the present case. The arguments *pro* and *con* will be found in the conflicting cases of *The People* v. *Morrison* (1 *Park. C. R.,* 625), *People* v. *Judges of Dutchess Oyer and Terminer* (2 *Barb. S. C. R.,* 282); *People* v. *Stone* (5 *Wend.,* 39); *People* v. *Comstock* (8 *Wend.,* 549); 2 *R. S.,* 739, *et seq., and Rev'rs Notes.* 2. But supposing such power to

exist before judgment, and whilst the proceedings are yet *in fieri,* it does not exist after judgment.    When sentence is once pronounced and recorded, so that a judgment record can be made up (2 *R. S.,* 738, § 4), the court is *functus officio* as to the particular case, and loses all further jurisdiction over it.    The organization and history of Courts of Oyer and Terminer in this State may be traced back to their commencement under the Colonial Government by reference to the following statutes: *Laws of* 1847, 331, 332, § 38, *et seq.,* § 43, *&c.; 2 R. S.* 201, § 4, *et seq.; 1 R. L.,* 1813, 335, *et seq.,* §§ 8, 10, 12, 15, *&c.; 1 K. and R.,* 174, §§ 6, 8, 10, *&c.; Laws of* 1683; *Orders of* 1699 *and* 1704, *in appendix to Bradford's Col. Laws, ed. of* 1710. 3. The Court of Oyer and Terminer is not a continuous court, but, like the circuit, ceases to exist on its adjournment, *sine die.* Hence no subsequent Oyer and Terminer has the power to interfere with the judgments of its predecessors.    These courts in this State take the place of and exercise the powers confided in England by commissions of Oyer and Terminer and Gaol Delivery.    The only difference is that here certain periods and persons are appointed for the holding of them, whilst there special commissions are issued for each assizes. (*See authorities under last subdivision, and also Fitzherbert's Nat. Brev.,* 110; *Jacob's L. Dic., Tit. "Oyer and Terminer," and Tit. "Gaol Delivery;" Tomlin's L. Dic., same titles; 4 Bl. Com.,* 269; *Miller's Case,* 9 *Cow.,* 730; 2 *R. S.,* 658, § 15; *Id. ib.,* 201, *et seq.,* § 4; *two courts,* § 5; *the several courts, &c.,* § 6; *one of the circuit courts, &c.,* § 14; *power to hold a Court of Oyer and Terminer,* § 22; *failure of court, parties bound to next court,* § 23; *to form such court,* § 28; *Court of Oyer and Terminer,* § 29; *each Court of Oyer and Terminer* (*not the Court of Oyer and Terminer for each county*), §§ 32, 33; *special commissions of Oyer and Terminer,* § 35; *special Court of Oyer and Terminer* (*not special term of the Court*), *id. ib.,* 737, §§ 28, 29, *contrast the phraseology "next term" and "next court;" id. ib.,* 659, § 23.)    If the Courts of Oyer and Terminer were continuous, why cast this duty on the Supreme Court?    The class of cases provided for could only arise in the Oyer and Terminer at the time the Revised Statutes

were enacted. 4. That Courts of Oyer and Terminer and Gaol Delivery were originally special courts, ceasing to exist on their final adjournment, is an undoubted fact in the judicial history of the States from the colonial period. If they ever underwent so radical a change in structure as to become continuous courts, it must have been by some enactment easily pointed out and plain in its interpretation. None such has been shown.

III. Conclusive as the argument on the law as written appears, that drawn from the reason of the law—the *argumentum ab inconvenienti*—is equally forcible. 1. It is not to be supposed that the Legislature intended to enact a system of laws for organization of criminal courts, which of necessity would be utterly inadequate to the punishment of crime. The power contended for here, if it exists, would be destructive of all government. There is no convict who cannot make out a plausible case for a new trial, and their incarceration would fully excuse any amount of laches in the application. The public is provided with no means of resisting such applications. The witnesses on whose testimony convictions have been had, are scattered to the four quarters of the globe; the means of perpetuating their testimony, or of preserving any authentic memorial of the evidence given on the former trials, has not been provided by law, and does not exist in fact. If the Courts of Oyer and Terminer, convened for the purpose of trying prisoners now under accusation of crimes, have power to go back and review the action of their predecessors, the result is easily divined. 2. The fact that there is no law or rule of court requiring any minute to be kept of the evidence on which the prisoner was convicted; no provision for the making or settling of a case embodying the evidence; none as to the time within which such a motion shall be made; no power on the part of the prosecution to detain witnesses after a verdict, or to compel affidavits in opposition to such a motion; no provision, either by statute or rule of court, having any reference whatever to such a proceeding; and no precedent for such a motion in the whole judicial history of the State, should of themselves be conclusive against the existence of the power

claimed. 3. The analogies drawn from the practice in civil cases have no application. In civil cases there are parties opposed, each having equal interests in the result; litigants and counsel, urged by the strongest human motives and passions, will assuredly elicit and perpetuate all the evidence bearing on the case to enable the court to render a safe and accurate judgment. Rules of court, and statutes exist in furtherance of this object. A motion for a new trial made on the minutes of the court must by law be made at the same term and before the same judge. (*Code*, § 264.) The reason is obvious. No other could understand the case from such notes, nor even the judge who made them, except while memory is fresh. Provision is made in other cases for the making and settling of a case after hearing both parties. If affidavits are to be used, either party can compel an unwilling witness to make one, and rules of court prescribe the periods within which such motion must be made, or the right to make it be lost. In criminal cases none of these conditions exist. 4. The scheme of our government and the distribution of powers under the Constitution, are at war with the right claimed here. The pardoning power was conferred on the Governor for the very purpose of correcting any errors of fact which might intervene in the conviction of a culprit. It is a power in trust, granted for public purposes only. Hence with us a pardon does not imply guilt, and the forgiveness of an offended sovereign, but is a recognition of the innocence of the accused, or at least of his unjust conviction.

The opinion of the court was delivered by

SELDEN, J. The first question to be considered is, whether the writ of prohibition was a proper remedy, assuming that the Court of Oyer and Terminer had no authority to grant a new trial upon the merits after conviction and sentence for the crime of murder.

The office of this writ is, to restrain subordinate courts and inferior judicial tribunals of every kind from exceeding their jurisdiction. It is an ancient and valuable writ, and one the

use of which in all proper cases should be upheld and encouraged, as it is important to the due and regular administration of justice that each tribunal should confine itself to the exercise of those powers with which, under the Constitution and laws of the State, it has been intrusted.

But it is said, that when the inferior court or tribunal has jurisdiction of the action, or of the subject matter before it, any error in the exercise of that jurisdiction can neither be corrected nor prevented by a writ of prohibition.

It is true that the most frequent occasions for the use of the writ are where a subordinate tribunal assumes to entertain some cause or proceeding over which it has no control. But the necessity for the writ is the same where, in a matter of which such tribunal has jurisdiction, it goes beyond its legitimate powers; and the authorities show that the writ is equally applicable to such a case. Mr. Jacob, in treating of this writ, after saying that it may issue to inferior courts of every description, whether ecclesiastical, temporal, military or maritime, whenever they attempt to take cognizance of causes over which they have no jurisdiction, adds: "or if, in handling of matters clearly within their cognizance, they *transgress the bounds* prescribed to them by the laws of England, as where they require two witnesses to prove the payment of a legacy." (*Jac. Law Dic., title Prohibition.*)

In the case of *Darby* v. *Cosens* (1 *Term R.*, 552), the defendant, who was vicar of the parish of Long Burton, had sued Darby in an Ecclesiastical Court for tithes, that being an action appropriate to the jurisdiction of that court; but the defendant having set up a modus by way of defence, an issue was presented which the Ecclesiastical Court had no authority to try— still, as it assumed to proceed with the case, upon application to the Court of King's Bench a writ of prohibition was issued.

The precise objection made here was taken in the case of *Leman* v. *Goulty* (3 *Term R.*, 3), where certain church wardens were cited in the Bishops' Court to exhibit on oath an account of the moneys received and paid by them. Objections being

made to one or two items of the account, the Bishop required them to pay a certain amount, and upon their refusing was. proceeding still further with the case when a rule was obtained in the Court of King's Bench to show cause why a writ of prohibition should not issue; and the counsel in showing cause insisted that as the Bishops' Court had original jurisdiction of the cause, the error should be corrected upon appeal, and was not a ground for a writ of prohibition; but the court allowed the writ, and Lord KENYON, after admitting that for a mere error in giving a judgment which the court had power to ren-der, the writ would not lie, said: "Now, in this case, with respect to the compelling of a production of the church warden's accounts, the Spiritual Court had exclusive jurisdiction; but there their authority ceases, and everything which they did afterwards was an excess of jurisdiction for which a prohibition ought to be granted."

These cases prove that the writ lies to prevent the exercise of any unauthorized power, in a cause or proceeding of which the subordinate tribunal has jurisdiction, no less than when the entire cause is without its jurisdiction. The broad remedial nature of this writ is shown by the brief statement of a case by Fitzherbert. In stating the various cases in which the writ will lie, he says: "And if a man be sued in the Spiritual Court, and the judges there will not grant unto the defendant the copy of the libel, then he shall have a prohibition, directed unto them for a surcease," &c., until they have delivered the copy of the libel, according to the statute made Anno 2 H., 5. (*F. N. B., title Prohibition.*)

This shows that the writ was never governed by any narrow technical rules, but was resorted to as a convenient mode of exercising a wholesome control over inferior tribunals. The scope of this remedy ought not, I think, to be abridged, as it is far better to prevent the exercise of an unauthorized power than to be driven to the necessity of correcting the error after it is committed. I have no hesitation, therefore, in holding that this was a proper case for the use of the writ, if the

Supreme Court was right in the conclusion to which it arrived at general term.

Had, then, the Court of Oyer and Terminer authority to make the order granting to the defendant, Quimbo Appo, a new trial? One position taken by the counsel for The People upon this question is, that the power, conceding it to exist, before judgment, cannot be exercised after judgment has been pronounced and the prisoner sentenced. I have not, however, been able to discover any solid basis for this distinction. There is no general principle upon which it can rest—nor am I aware of any analogies to support it. If the ends of justice require that this power should be vested in Courts of Oyer and Terminer, that demand is just as imperious where judgment happens to have been pronounced before the grounds for the interposition of the court are made known as in other cases. If the judgment stands in the way, it may be vacated. The court does not become, as claimed by the counsel, *functus officio* as to the particular case whenever sentence is pronounced. Suppose, for instance, the court through inadvertence should sentence the prisoner without inquiring of him whether he had anything to say why sentence should not be pronounced. If the position is sound, this error, although immediately discovered, could not be corrected by the court which committed it. It would be not only unsupported by authority, but unsafe, I think, to hold, as we must if we sustain the doctrine contended for, that a Court of Oyer and Terminer loses all control over the cases before it as soon as the judgment is recorded.

Another position of the counsel is, that if it be admitted that the court before which the prisoner was tried could grant a new trial, yet another Court of Oyer and Terminer subsequently organized, being a distinct court, had no jurisdiction of the case, and could not exercise that power.

This involves an inquiry into the nature of Courts of Oyer and Terminer in this State, and how far they resemble the English courts of that name. In England, although Courts of Oyer and Terminer are annually held in every county of

the kingdom at least once, and in most of the counties twice, yet each court is held by virtue of a special commission, authorizing any two of the persons to whom it is addressed to hold the court. The commission usually embraces two of the judges of the Courts of Westminster, one of whom, or a serjeant at law, when such a one is named in place of a judge, must always be present or the court cannot be held. The operative words of the commission are, " to inquire, hear and determine," and the commissioners have no power except such as is conferred by these words.

Hence, as they must inquire before they can hear and determine, they can try no indictments except such as are found at the same court. This difficulty, however, is overcome by a second commission of Gaol Delivery, as it is called, which authorizes them to deliver the gaol of all prisoners found therein upon their arrival at the place where the court is held, and by virtue of this power they try all indictments, whatever the offence or wherever found.

This commission may be to different persons, but for convenience is usually to the same persons who compose the Court of Oyer and Terminer. Besides these more general commissions, special commissions may be issued by the King at any time to try either specific offences, or the individuals named. Of course, upon the final adjournment of any of these courts in any county its powers are ended. It no longer has any existence so far as that county is concerned, and there is no longer any Court of Oyer and Terminer or of Gaol Delivery, as the case may be, in and for such county, until a new commission issues.

Hence it is plain that no subsequent Court of Oyer and Terminer, as such, could interfere in any way with any case commenced at a previous court, because it must first inquire, then hear and determine. How far its powers as a Court of Gaol Delivery might extend, I am not prepared to say; but no court in England has, I think, ever assumed to take cognizance under this power of a motion for a new trial, even for irregularity, in a case tried at a previous court. It has been held there that the

judges of the Courts of Oyer and Terminer and Gaol Delivery may, after the adjournment of the courts, and after their commissions have expired, grant a reprieve in a case of a prisoner previously convicted and sentenced, in order to afford time to apply to the crown for a pardon. But Blackstone says that even this is "rather by common usage than of strict right." (4 *Blackstone Com.*, 394.)

If, therefore, no substantial difference were found to exist b:tween our Courts of Oyer and Terminer and Gaol Delivery and those of England, I should think it a sufficient objection to the order granting a new trial in the present case, that it was not made by the same court in which the case was tried.

But our Courts of Oyer and Terminer, although they have the same name and a similar jurisdiction with those of England, are nevertheless in some respects differently organized. I do not think it necessary to inquire whether the "act to settle Courts of Justice," published in the appendix to volume 2 of the Revised Laws of 1813, and bearing date in 1683, was ever in force in this State or not. It will sufficiently exhibit the present structure of the court to refer to a few of the more modern enactments on the subject.

Section 13 of article 4 of the Constitution of 1821, provides as follows: "The Clerk of *the* Court of Oyer and Terminer and General Sessions of the Peace, in and for the city and county of New York, shall be appointed by the Court of General Sessions of the Peace in said city, and hold his office during the pleasure of the said court." This language necessarily implies that the Court of Oyer and Terminer was regarded as a permanent and continuing court. Under the English system there was no Court of Oyer and Terminer in existence, except while a particular set of commissioners were in session. There could be no clerk of such a court during the interval between the expiration of one commission and the issuing of another, nor could the definite article *the* be appropriately used in such a connection as in the clause quoted, except in reference to some particular session of the court.

The phraseology applied to the English court seems to have been continued in this State until after the Constitution of 1821 was adopted. Thus, section 8 of the article concerning Circuit Courts and Courts of Oyer and Terminer, passed in 1813 (1 *R. L.*, 337), uses this language: "A quorum of the commis-sioners," when speaking of the Court of Oyer and Terminer. I presume, however, that no commission was in fact issued at that day, if ever, in this State, and in the act concerning the Supreme and Circuit Courts and Courts of Oyer and Terminer, passed in 1823 (*Laws* 1823, 211, § 9), it was expressly provided that the judges of the County Courts, together with one of the circuit judges or a justice of the Supreme Court, might, "by virtue of their respective offices" and that act, and "*without any other commission*," hold the Circuit Courts and Courts of Oyer and Terminer, &c., of the respective counties. From that time the English system of organizing these courts by special commission was no longer adhered to, either in form or lan-guage.

By section 40 of the title of the Revised Statutes concerning Circuit Courts and Courts of Oyer and Terminer (2 *R. S.*, 207), it is declared that the seals previously adopted by the several Courts of Oyer and Terminer and Gaol Delivery "shall con-tinue to be the seals of these courts respectively;" and section 42 of the same act provides that process issued out of a Court of Oyer and Terminer when such court is not in session "may be tested on any day in the last preceding *term* of the said court." This section treats the court as in existence, although not in session, and as having a succession of terms.

Again, the Code enacts, section 20, that "there must be two *terms* of *the* Circuit Court and Court of Oyer and Terminer held annually in each of the counties of this State, and as many more terms thereof, and as many special terms, as the judges of each judicial district shall appoint therein."

These provisions leave no doubt that the English Court of Oyer and Terminer has been so far modified under our judicial system as to become a permanent and continuous court in each of the counties of the State, so that each session of such a

court in any county, instead of being a distinct and independent court, the existence of which commences with the first and terminates with the last day of the session, is a mere term of the Court of Oyer and Terminer for that county. Hence the writ of prohibition in this case cannot be sustained upon the ground that the court which has assumed to take cognizance of the motion for a new trial is not the same court in which the prisoner was convicted.

It becomes necessary, therefore, to pass upon the question whether Courts of Oyer and Terminer in this State have authority to grant a new trial upon the merits, after conviction in a capital case. This question has been somewhat agitated in our courts, and there are conflicting decisions upon it, the result of which it will be well in the outset to ascertain; because, however it might have been originally, if the question has been settled by the courts of this State, we should not feel at liberty to disturb it.

In referring to the cases I will begin with the more recent. There are, then, two decisions of our present Supreme Court upon the subject: One made at the general term in the second district in the case of *The People* v. *The Dutchess Oyer and Terminer* (2 *Barb. S. C. R.*, 282), the other at the general term in the third district in the case of *The People* v. *Morrison* (1 *Park. C. R.*, 625). In the first of these cases the power, after an elaborate examination, was denied; and in the last, after an examination equally elaborate, it was affirmed. As these were coördinate courts of equal jurisdiction and grade, they may properly be considered as balancing each other. I speak of their weight as decisions merely, irrespective of the reasoning in the two cases. The fact that one was a few years later than the other, considering the nature of the question and the position of the courts, does not materially affect their relative force. The question, therefore, may fairly be considered as standing, so far as authority is concerned, substantially where it was left by the previous cases.

We have next two decisions of the former Supreme Court similarly situated : First, that in the case of *The People* v. *Stone*

(5 *Wend.*, 39), where the power was asserted: and next, that in *The People* v. *Comstock* (8 *Wend.*, 549), in which it was denied. It is suggested in *The People* v. *Morrison* that the remarks of SUTHERLAND, J., in the last of these cases, were made through mere inadvertence, without reflecting that the same court had, two years before, decided the other way. I find it difficult to adopt this explanation. It supposes that Judge SUTHERLAND and Judge SAVAGE had both entirely forgotten the case of *The People* v. *Stone*, and not only so, but that Mr. Wendell also, who had but just reported the former decision, neglected to call the attention of the judges to the obvious discrepancy. The point was one calculated to awaken attention, especially when elaborately discussed, as it was by MARCY, J., in his opinion; and the case of *The People* v. *Comstock* could hardly, I think, have found its way into the books if the pointed and emphatic remarks of SUTHERLAND, J., in that case had been inadvertently made. From the tone of those remarks I think it much more likely that the latter justice, although not entirely satisfied with the opinion of MARCY, J., in *The People* v. *Stone*, had not chosen to dissent, and that he availed himself of the case of *The People* v. *Comstock*—MARCY, J., having in the meantime left the bench and NELSON, J., having taken his place—to express his own views upon the question, the latter justice probably concurring with him.

The case of *The People* v. *Comstock* may therefore fairly be considered as a counterpoise to that of *The People* v. *Stone*, because, although the precise point was not involved in the last of the two cases, yet what was then said must, I think, have been said upon full consideration of the reasoning in the previous case. Taking the two cases together, therefore, and construing them by such light as we have, they show the opinions of SAVAGE, Ch. J., and MARCY, J., in favor of, and of SUTHERLAND and NELSON, Js., against the power.

Besides the cases already referred to, there are two of an older date to which I will briefly advert. The first is the case of *The People* v. *Townsend* (1 *John. Ca.*, 104), where the prisoner having been convicted at the Oyer and Terminer for

perjury, the judge before whom he was tried reported to the Supreme Court that the verdict was against evidence, and the latter court directed a new trial. Judge RADCLIFFE, who was on the bench at that time, is reported to have said in the case of Noah (3 *City Hall Recorder*, 24), that the Supreme Court virtually decided in the case of Townsend that Courts of Oyer and Terminer had power to grant new trials. But if so there was no argument or even counsel in the case, and the whole seems to have been very hastily and informally done. From what appears upon the face of the report, the case cannot be considered as of any considerable weight.

The other case referred to is that of *The People* v. *The Justices of Chenango* (1 *John. Ca.*, 179). The Supreme Court in that case denied the right of a Court of General Sessions to grant new trials upon the merits, and issued a *mandamus* to compel them to proceed to judgment in a case where they had exercised that power, after conviction for a felony. This case has ever been considered as settling the question as to the power of Courts of General Sessions in this State to grant new trials; and much of its reasoning applies as well to Courts of Oyer and Terminer as to Courts of General Sessions, if the former are to be regarded as inferior courts.

The term 'inferior,' as applied to courts, has no very definite meaning. It is used in different senses. In the sense of being courts of very narrow and restricted jurisdiction, Courts of Oyer and Terminer are not inferior; but in the sense of being subordinate to the Supreme Court, and subject in common with all other minor tribunals to its supervisory control, they certainly are. Courts which are subject to be put in motion by *mandamus* or restrained by prohibition, and to have their causes taken away before judgment by *certiorari*, are subordinate courts; and this is all that is necessary to give to the reasoning of the court in the case of *The People* v. *The Justices of Chenango*, its full force when applied to Courts of Oyer and Terminer. The court in that case, speaking of the Courts of General Sessions, say: "Writs of error, certiorari, mandamus, and attachment issue to it from this court. Those writs con-

clusively show it to be *subordinate,* and prove the authority which has always been exercised over it.   *     *     *     *
These courts are wholly independent of each other, and if their proceedings were not subject to be here reviewed, we might find different rules of law and of justice in almost every county.   This would introduce disorder and confusion, and be inconsistent with a regular and uniform administration of justice.   The power of granting new trials can only be applied in a manner *which precludes the possibility of its exercise being reviewed in this or any other court.*   *     *     *     *   If this power did exist, therefore, in an inferior court, it would exist *without regulation or control.*"   Substitute the word *subordinate* for that of "inferior," in the last sentence, and every idea contained in this extract applies with the same force to Courts of Oyer and Terminer as to Courts of General Sessions. The courts of the several counties have the same independence of each other; their proceedings in granting new trials would not be subject to review, and would be wholly without regulation or control.   This case, therefore, cannot but be considered as greatly preponderating over any weight which can by possibility be given to the case of *The People* v. *Townsend.*

From this brief review of the cases in this State, it is difficult to say in what direction, when the authorities are fairly weighed, the scales would incline.   I assume that they are evenly balanced; but whether this assumption is just, or whether the preponderance should be considered as in favor of the power, does not in the least affect my view of the present case; for it cannot be contended that there exists that clear and settled course of decision which should preclude any further examination of the subject.

It is to be looked at, then, substantially as an original question, and as if it had now arisen for the first time.   It is not controlled by any statute, and hence what we are called upon to decide is whether, by the common law, Courts of Oyer and Terminer have the power to grant new trials upon the merits, after conviction in a capital case.

It is settled beyond dispute, in England, that no new trial can be granted upon the merits in such a case, even by the highest courts. This is conceded in *The People* v. *Stone* and *The People* v. *Morrison*. The authorities on the subject are referred to in the cases of *The People* v. *Comstock* and *The People* v. *The Dutchess Oyer and Terminer* (*supra*), and it is unnecessary to repeat them here. If, then, new trials are to be granted in such cases by our courts, a new rule must be introduced, and the question is upon what ground of principle this can be done. New rules may be adopted when new cases arise. It is considered one of the chief merits of the common law, that it is plastic and flexible, and accommodates itself readily to the new phases which the affairs of the world are constantly assuming. But in the case under consideration there is nothing new, and the courts are asked not simply to apply a rule which, although in harmony with the general and fundamental principles of the common law, has never been before adopted, but to go in direct opposition to what is acknowledged to have been the settled rule of the common law for centuries.

This court and the Supreme Court have the power, if not the right, to legislate and to amend the common law, and no doubt their legislation would be as wise as much that proceeds from more legitimate sources; but the better opinion I think is, that each department of the government should confine itself to the exercise of its appropriate functions, and not encroach upon those of any other. It is shown in the case of *The People* v. *Morrison* that in most of the States of the Union the courts have assumed the powers contended for here, and this is urged as authority by which our courts should be governed. But it is the common law of England, and not that of Pennsylvania or Alabama, which we have adopted. Upon all questions upon which there is any doubt, we pay high respect to the decisions cf the courts of other States, but when the law is known and conceded, the fact that other States have confessedly disregarded and departed from it, is entitled to very little weight.

Judge MARCY, in *The People* v. *Stone*, devotes most of his argument to proving that Courts of Oyer and Terminer in this

State are not inferior courts. But this, if established, is in no manner decisive of the question, as by the common law no court, high or low, could grant new trials upon the merits, after conviction in a criminal court in cases of felony. The principal reason he gives for departing from what he admits to be the settled rule of the English common law is, that notwithstanding the pardon of a criminal who has once been convicted, "the foul blot remains upon his reputation." It may, I think, be safely assumed that in most cases the criminal so situated, if allowed to choose, would prefer to take the pardon rather than to avail himself of the privilege of a second trial.

But it matters not, in my view, how strong may be the reasons given in the cases of *The People* v. *Stone* and *The People* v. *Morrison* for a change in the law. The question we are called upon to consider is not whether the admitted rule of the common law was, or is, wrong, and ought to be changed, but whether that change should be wrought by the courts or left to the action of the Legislature.

The whole course of judicial as well as legislative action in this State, until the decision in *The People* v. *Stone*, indicates very clearly, I think, a general understanding that Courts of Oyer and Terminer could not grant new trials in such cases. In the case of *The People* v. *McKay* (18 *John.*, 212), where it became necessary to move in arrest of judgment, on the ground that no venire had been issued, the cause was removed into the Supreme Court by *certiorari*, and the prisoner brought up by *habeas corpus* in order that the motion might be made there. In the case of Douglass (4 *Cow.*, 26), convicted of murder in the county of Steuben, where a motion was made to set aside the verdict for certain irregularities on the part of the jury, the same course was taken; and in the case of *The People* v. *Ransom* (7 *Wend.*, 417), who was found guilty of murder in the city of New York, judgment was suspended in order that the question of regularity might be presented to the Supreme Court.

The bearing of the proceedings in these cases will be seen, when it is considered that even the subordinate and inferior common law courts in England have power to set aside ver

dicts in cases tried before them for irregularity.   Our Courts of Oyer and Terminer, it seems, have always hesitated to exercise even this minor power.

The Legislature also, in providing for the correction of errors in law by means of bills of exception, and making no provision as to new trials for mistakes in regard to matters of fact, has, I think, indicated its opinion not only that new trials could not be granted in cases of that kind, but that they had better be left, as by the common law they are left, to the action of the pardoning power.

It is by no means certain that such would not be the better course, even if we had power to determine the question upon grounds of expediency alone.   Certainly it would, I think, unless at the same time some rules could be adopted by which the exercise of the power should be in some degree regulated.

The Legislature, in permitting motions for new trials to be made upon the minutes of the judge in civil cases, has imperatively required that they should be made at the same term at which the cause is tried. (*Code*, § 264.)   There is every reason why this rule should be applied to motions for a new trial upon the facts in cases of felony, if such motions are to be permitted, unless some provision is made for embodying the facts in an authenticated form.

The suffering of such motions to be made before another judge at a subsequent term, without any provision as to the manner in which he should become possessed of the facts of the case, would, I apprehend, be attended with very serious inconvenience.   There is great danger, too, that the privilege, if allowed without being subjected to some precautionary restrictions, will be used to delay and embarrass the administration of criminal justice, already sufficiently difficult.

The subject, taken as a whole, can only be adequately dealt with by the Legislature, to which it appropriately belongs, and I am entirely opposed to so obvious a stretch of judicial power as would be involved in holding that our Courts of Oyer and Terminer, without the aid of any statute, possess a control over

convictions for crime, which it is conceded was never possessed by the highest common law courts in England.

The judgment should, I think, be affirmed.

CLERKE, J.   The question which seems to have been debated in this case is, whether a Court of Oyer and Terminer, held at a term subsequent to that in which a person has been convicted and sentenced, can grant him a new trial.   It does not appear to have been asserted in the argument, either here or in the Supreme Court, that for offences greater than a misdemeanor, a new trial cannot be granted by any court on the merits.   Certainly, however, this is the rule of the common law.   It has been always tenaciously maintained in England down to the present day, that where the defendant has been convicted on an indictment for felony, there can be no new trial, except for irregularity, or some other extrinsic cause.   Has this well-established and, I think, salutary rule been changed in this State?

The cases in our reports on this subject are not numerous, and are far from being unanimous. ' The first which I find is that of *The People* v. *Townsend* (1 *J. C.*, 104), where it was held by the Supreme Court, in April, 1799, that a Court of Oyer and Terminer may award a new trial; but the crime for which the defendant was indicted was perjury, at that time considered in this State—as at common law—to be merely a misdemeanor. It was made felony only by the Revised Statutes.   In *The People* v. *The Sessions of Chenango* (2 *Caines' Cases in Error*, 319), the court decided, to be sure, only that the Court of Sessions being an inferior court, could not grant a new trial; but KENT, J., in delivering the opinion of the court, says, "The Sessions cannot grant a new trial upon the merits.   It is a power not exercised by this (the Supreme) Court, after verdict in cases of felony; and, perhaps, it is expedient it should not be."   In *The People* v. *Stone* (5 *Wend.*, 39), the court, indeed, held that Courts of Oyer and Terminer had authority to grant new trials on the merits in all cases, and entirely ignored the rule of the common law.   But this decision was expressly overruled by the same court in *The People* v. *Comstock*, where it is declared

Quimbo Appo v. The People.

that for offences greater than misdemeanor, a new trial cannot be granted on the merits, whether the accused be convicted or acquitted; and Mr. Justice SUTHERLAND, who delivered the opinion of the court, quotes the language of Garrow, *arguendo*, in *The King* v. *Mawbey and others* (6 *Term R.*, 625) that: "If a defendant be convicted of felony or treason, though against the weight of evidence, there is no instance of a motion for a new trial in such a case; but the judge passes sentence and respites execution, till application be made to the mercy of the Crown." Lord KENYON, who delivered the opinion of the court in that case, speaks to the same effect. Judge SUTHER-LAND also quotes from *Chitty's Criminal Law* (532) the following language: "In cases of felony or treason, it seems to be completely settled, that no new trial can in any case be granted; but if the conviction is improper, the prisoner must be respited until a pardon be applied for." The same rule is very ably maintained by Judge STRONG in *The People* v. *The Judges of the Dutchess Oyer and Terminer* (2 *Barb.*, 282). The cases of *The People* v. *Morrison* (1 *Park. C. R.*, 625); *The People* v. *Goodrich* (3 *id.* 519), and *The People* v. *Hartung* (17 *How. Pr. R.*, 86), were all decided in the Court of Oyer and Terminer; in which that court held it had the power to grant new trials in the very face of the decision by the Supreme Court in *The People* v. *Comstock.* It is not pretended that the rule of the common law has been altered by statute. Our statutes say nothing of this power, except in cases where exceptions on legal questions have been taken on the trial on behalf of the defendant. In such cases where the Supreme Court reverse the judgment, they provide that the court shall either direct a new trial, or that the defendant be absolutely discharged, according to the circumstances of the case.

It is stated, in the points of the plaintiff in error, that in England the old rule has been condemned by her wisest lawyers and judges, and is now abandoned. This is a mistake. It is only about three weeks ago, during the present session of Parliament, that Mr. McMahon introduced a bill in the House of Commons to allow new trials to be granted in all criminal

cases. It gave rise to a very interesting debate, which is contained in the London Times, I think, of 19th of last January. The members opposed to the bill proved, satisfactorily to my mind, that the repeal of the present rule would most seriously, if it did not altogether, jeopardize the administration of criminal justice in England. A large majority voted against the bill.

The right to a new trial in cases of felony would work still greater detriment in this State. The witnesses on whose testimony defendants are convicted, are apt to be more migratory than in England; and the law has provided no means of perpetuating their testimony, or of preserving any authentic memorial of their evidence. In every case there would be repeated applications for a new trial; so that in the city of New York, where the district attorney is unable, from the multitude of cases, to bring all to trial, a fearful obstruction to the administration of justice would be the consequence.

The only judicious and practicable remedy for erroneous verdicts in criminal cases, is that of the pardoning power. No stigma, as has been supposed, necessarily adheres to a defendant who has been unjustly found guilty of a crime, when he receives the pardon on the express ground that the verdict was contrary to the weight of evidence. I place my opinion, therefore, on the ground not merely that a Court of Oyer and Terminer has no power to grant a new trial, where the verdict has been rendered at a previous Oyer and Terminer, but that no court has power, in cases of felony, to grant a new trial on the merits, under any circumstances.

The power to issue a writ of prohibition clearly still resides in the Supreme Court; it is expressly recognized in the Revised Statutes. (2 *R. S.*, 587, § 61.)

The order of the Supreme Court should be affirmed.

BACON, J. (Dissenting.) Anticipating that I shall disagree with a majority of my brethren, and very reluctantly dissenting from the judgment which is about to be pronounced, I only desire in a very few words to express the grounds of that dissent.

Quimbo Appo *v.* The People.

I concur entirely in the opinion that the writ of prohibition was a proper mode to be adopted by the district attorney to stay the action of the Oyer and Terminer, provided that court had not power to give the relief asked for by the prisoner, and grant the application for a new trial. It may be a very ancient remedy, and has undoubtedly been rarely resorted to in our recent practice. It is, however, expressly provided for in the Revised Statutes of 1830, and the practice under it regulated in various respects; and in 1838 there is an instance reported of its having been issued to a Court of General Sessions by the Supreme Court. (*The People* v. *The Tompkins General Sessions*, 19 *Wend.*, 154.) Probably many other cases have occurred where it has issued as a matter of course, without any question being made as to the propriety of the practice, or the power of the court. The case of *The People* v. *The Supervisors of Queens* (1 *Hill*, 195), where it is said to have been disapproved, did not proceed upon any doubt or denial of the propriety of the writ in a case to which it was applicable. It was attempted to be used in that case to restrain the proceedings of a ministerial officer in the execution of process in his hands, but while refusing this the court expressly conceded the propriety of issuing the writ to restrain a court in which some judicial proceeding is pending. This writ is also among those the practice in respect to which is saved by § 471 of the Code; its continuance and operation being thus expressly recognized.

The only question, then, in this case is, whether a Court of Oyer and Terminer, at a term subsequent to that at which a prisoner has been tried and convicted, and judgment rendered upon the conviction, has power to grant a new trial. The question is an important one, and if it were wholly *res integra*, and for the first time to be discussed and passed upon, I should esteem it one of no small difficulty. At any rate it falls within that category where much may be said, and pertinently and plausibly said, too, upon both sides. I do not go into the question of the original constitution of Courts of Oyer and Terminer in England, nor the various modifications and enlargements of their powers by statutes enacted from time to time. On this

point our own Constitution and laws afford also a field for considerable discussion and remark, into which I shall not enter. My conclusion, without at this time indicating the grounds upon which it rests, is that the Courts of Oyer and Terminer, as organized and acting within this State, are superior courts of general criminal jurisdiction, continuous in their character and operation, and not a merely temporary organization, expiring at the close of each session or term thereof. This being conceded or established, it necessarily follows that a motion founded upon a proceeding trial or judgment at a preceding term, can be entertained and decided at any subsequent term of the same court, whether held by the same judges or by others of equal authority and coördinate jurisdiction.

, Without, then, going into the argument, I consider the power of Courts of Oyer and Terminer to grant new trials as established by a most controlling weight of authority, and that this power may be exercised at a term subsequent to that at which a conviction has taken place and judgment rendered. In the case of *The People* v. *Townsend* (1 *John. Ca.*, 104), the defendant had been convicted of perjury, but before sentence was pronounced he absconded. He afterwards surrendered himself, and the presiding justice reported to the Supreme Court that the verdict was against evidence. The opinion of the Supreme Court was asked, and they answered that there should be a new trial, and directed that opinion to be communicated to the judges at the next Oyer and Terminer to be held in the county where the trial took place. The case, in effect, is an adjudication of the Supreme Court, given by way of advice, that the Oyer and Terminer had power to grant a new trial where the verdict was against evidence, and in that case the application and a decision thereon would necessarily be made at a subsequent session of the court. In the case of *The People* v. *Stone* (5 *Wend.*, 39) the same question arose. The defendant had been convicted in Rensselaer county, and an application was made to that court for a new trial, whether at the same or a subsequent term does not appear from the statement of the case. The court, doubting its power, suspended sen-

tence in order that an application might be made to the Supreme Court for its opinion on this point.   That opinion was given by MARCY, J., and after discussing the question with fullness and ability he concludes by saying, " upon principle and authority I have no doubt but that the power to grant new trials upon the merits resides in the Courts of Oyer and Terminer and Gaol Delivery ;" and that was the judgment of the court.

It is true that in the case of *The People* v. *Comstock* (8 *Wend.*, 549), Judge SUTHERLAND was, probably by an inadvertence, betrayed into the expression of an opinion that in a case of felony no new trial could be granted, whether the defendant was acquitted or convicted.   He seems to have lost sight of the case of *The People* v. *Stone*, in the decision of which he took part, and of the fact that Comstock having been acquitted, he was secured by the constitutional immunity from the jeopardy of another trial.   The case has never been considered as an authority in denial of the power of the court to grant a new trial in a proper case.

The case of *The People* v. *Stone* has been followed by several subsequent cases.   In *The People* v. *Morrison* (1 *Park. C. R.*, 625), in a very able and elaborate opinion, Judge HARRIS vindicates the power of a Court of Oyer and Terminer to grant a new trial, and places it, in my judgment, on impregnable grounds, both of principle and authority.   He takes occasion to show, also, that this power is in full exercise in at least eighteen of the States of the Union, and that the English rule which denies new trials in criminal cases, but turns over the subject to the royal clemency, has never been adopted or recognized by the courts of this county.

In the case of *The People* v. *The Court of Sessions of Wayne County* (1 *Park. C. R.*, 369), at general term in the seventh district, a decided opinion was expressed that the power resides in Courts of Oyer and Terminer, although its existence in Courts of Sessions, which are of limited and inferior jurisdiction, was denied.   " Courts of Oyer and Terminer," says Mr. Justice JOHNSON, "have full criminal jurisdiction, and are the only courts in the State having such powers."

In *The People* v. *McMahon* (2 *Park. C. R.*, 673), Mr. Justice PARKER concurs fully in the conclusion of Judge HARRIS in the case of Morrison, and says he has conclusively demonstrated the power of Courts of Oyer and Terminer to grant new trials. In this opinion Judge BALCOM (*People* v. *Goodrich*, 3 *Park. C. R.*, 518) also unites; and in *The People* v. *Hartung* (17 *How.*, 86), the motion for a new trial in a capital case was entertained at an adjourned circuit without any question as to the power of the court being suggested by the counsel or alluded to in the opinion of Judge HARRIS. In truth, I have no doubt this practice has been well understood and acted upon throughout the State for a long series of years, and I am not aware that it was ever seriously called in question until the opinion of Mr. Justice STRONG was given in the case of *The People* v. *The Judges of Dutchess Oyer and Terminer* (2 *Barb.*, 282). This case undertook to overrule the decision of the Supreme Court in *The People* v. *Stone*, which had been accepted as the law by which all the tribunals of the State had been governed for seventeen years. If such a thing is to be done it should be either from a conviction that the elder decision was hasty and not well considered, or the course of reasoning by which the old doctrine is to be subverted and the new installed in its place should be so clear and convincing that the mind unhesitatingly yields to it. The decision in the case of Stone is not by any means an unadvised one, for the opinion is by MARCY, and the course of reasoning by which it is upheld extends over some half-dozen pages—more, indeed, than Judge STRONG employs to overcome it—and I am quite unable to detect the superior force of the reasons by which it is encountered and sought to be overthrown. If anything were needed to re-instate the authority of *The People* v. *Stone* it will be found amply supplied in the full and exhaustive opinion of Judge HARRIS in the case of Morrison, and the assent which has been yielded to that case by all succeeding authority.

The power, then, to grant new trials, I think, beyond question, exists in the Courts of Oyer and Terminer, and for reasons that make that authority plenary for all the purposes of a

motion at the same or any succeeding term. Nor is it any greater objection to its exercise that judgment has been pronounced, than can be urged in a civil case where the same fact exists. If the court has the power, the mere fact that judgment has been formally rendered cannot deprive it of its jurisdiction. And so, in effect, it is decided in *The People* v. *Stone* (9 *Wend.*, 182), where the Court of Oyer and Terminer, after rendering judgment quashing an indictment at a subsequent term gave leave to the public prosecutor to make up a record as if judgment had been rendered for the defendant on demurrer, for the purpose of enabling him to sue out a writ of error. So in *Miller* v. *Finkle* (1 *Park. C. R.*, 374), where a conviction was had and a sentence actually passed, the court at the same term vacated the sentence and pronounced a new sentence for a different term of imprisonment. It is not, then, the fact that a judgment has been rendered that makes the court *functus officio* and deprives it of any power of ulterior action. Possessing the right, I suppose it can be exercised at any time before final execution.

It is said by the counsel of The People, in opposition to the assertion and exercise of this power in the Courts of Oyer and Terminer, that the scheme of our government and the distribution of powers under the Constitution are at war with the right thus claimed. It is insisted that the pardoning power was conferred upon the Executive for the very purpose of correcting any errors of fact that might occur in the prosecution and conviction of a supposed culprit, and that pardon does not imply guilt. I do not coincide in this view. On the contrary I think with us, in the administration of the criminal law and in dealing with offenders who have been subjected to its action, the normal and necessary association with the word pardon is the idea of guilt. The office of the Governor is not to reverse unjust or illegal decisions, but to remit the punishment due to the guilty. If innocence is claimed, or an improper conviction has been obtained, then justice requires a new trial. The mercy which is thus invoked is but a poor palliative for the injury that may have been inflicted. I agree with Judge MARCY that " it is

mockery to tell a man who has been unjustly condemned that his redress is a pardon. He feels, and ever will feel, that he has received an incurable wound from that sword which he, in common with his fellow citizens, had put into the hands of the magistracy for their protection."

The case made in the court below was one appealing very strongly to the reason of that tribunal to grant a new trial. It was certainly from no fault of the court before which the defendant was tried that the trial resulted in a conviction. A number of unfortunate circumstances concurred in presenting him before the jury substantially without defence, and yet standing thus unaided and unshielded before them, there war evident hesitation with the jury in convicting him of the crime of murder. There is every reason to believe that on another trial the crime laid to his charge will, if not excused, be greatly mitigated. I think it is eminently due to this comparative stranger to us and our institutions—this "waif," as he has been appropriately called, cast upon our shores from "the central flowery kingdom"—that he should have one more opportunity to show the extenuations of his offence, even if he cannot suc- ceed in wholly purging himself of crime.

I think the order of the general term granting the writ of prohibition should be reversed, and the order of the Oyer and Terminer granting a new trial affirmed.

Judgment affirmed.